IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DESMOND GODSON,**<br><br>*Plaintiff*,<br><br>v.<br><br>**CITY OF PHILADELPHIA, JORDAN HARRIS, and JEROME L. WATSON**<br>*Defendants*. | **CIVIL ACTION**<br><br>**NO. 24-6461** |

Baylson, J.                                                                                 July 16, 2025

### MEMORANDUM RE: DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT

Presently before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint. For the reasons detailed below, the Motion is denied.

**I.    FACTUAL BACKGROUND**

Given that the Court has already addressed a prior Motion to Dismiss, it will not reiterate the factual background in full. The pertinent facts are as follows. Plaintiff, Desmond Godson, was allegedly attacked by Corrections Officers Harris and Watson while in pretrial detention at Philadelphia Detention Center. Second Amended Complaint ("2d Am. Compl.") at ¶¶ 7, 8. Godson suffered serious injuries including a broken arm that necessitated surgical placement of two plates, facial trauma, permanent nerve damage, and injuries to his head and face. Id. at ¶¶ 9, 13, 16. While convalescing from his arm surgery Godson contracted MRSA, which Defendants allegedly failed to properly treat, and required a second surgery to remove the infection. Id. at ¶¶ 16, 18, 19.

1

II.  **PROCEDURAL HISTORY**

On March 10, 2025, the Court granted in part and denied in part Defendants' first Motion to Dismiss. ECF 4, 9. The Court dismissed Godson's § 1983 withholding of medical care, § 1983 conspiracy, Monell claim predicated on unsanitary prison conditions and denial of medical care, and § 1985 conspiracy claims without prejudice. MTD Memo. at 20-21, ECF 9. The Court dismissed Godson's remaining Monell claims with prejudice. Id. Following Godson's March 20, 2025, Motion for Reconsideration, ECF 10, the Court granted Godson leave to replead all Monell claims identified in the first Complaint, including excessive force, cruel and unusual punishment of prisoners, and malicious prosecution of prisoners to cover up constitutional violations. ECF 11. Prior to the Court's ruling on the Motion for Reconsideration, Godson filed a First Amended Complaint, ECF 15, that Defendants moved to dismiss on April 17, 2025, ECF 17. Upon granting the Motion for Reconsideration, the Court denied Defendants' April 17, 2025, Motion to Dismiss as moot. ECF 20. On May 8, 2025, Godson filed his Second Amended Complaint, ECF 21, following which, on May 22, 2025, Defendants filed a Motion to Dismiss, ECF 22. Godson responded on June 19, 2025, ECF 25, and Defendants filed a Reply on June 26, 2025, ECF 26.

The Second Amended Complaint brings eleven claims, the first nine of which are against Harris and Watson and the remaining two of which are Monell claims against the City. The Court previously found that Godson sufficiently pled (1) Use of Excessive Force (Count I), (2) Bystander Liability/Failure to Intervene (Count II), (3) Assault and Battery (Count III), (4) Intentional Infliction of Emotional Distress (Count IV), and (5) Conspiracy to Use Excessive Force (Count V). See Godson v. City of Phila., 2025 WL 757101, at *20-21 (E.D. Pa. Mar. 10, 2025) (Baylson). The following claims, brought against Harris and Watson, are still at issue:

2

(1) Unreasonable Search and Seizure pursuant to 42 U.S.C. § 1983 (Count VI),

(2) Conspiracy to Deprive Plaintiff of Access to the Courts pursuant to 42 U.S.C. § 1983 (Count VII),

(3) Conspiracy to Deprive Plaintiff of Equal Access to the Laws pursuant to 42 U.S.C. § 1985 (Count VIII),

(4) Denial of Medical Care pursuant to 42 U.S.C. § 1983 (Count IX).

The following claims, brought against the City, are still at issue:

(1) Monell claim for Unsanitary Conditions and Denial of Medical Treatment (Count X),

(2) Monell claim for Unnecessary and Excessive Force (Count XI).[1]

### III. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule 12(b)(6), a plaintiff must include sufficient facts in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint is insufficient if it suggests only the "mere possibility of misconduct" or is a "[t]hreadbare recital[ ] of the elements of a cause of action, supported by mere conclusory statements," Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009) (citing Twombly, 550 U.S. at 555), and so it will not suffice if it is "devoid of further factual enhancement," Iqbal, 556 U.S. at 678 (citation omitted). Thus, in considering a motion to dismiss, the Court accepts all factual allegations as true and views them in a light most favorable to the plaintiff, Doe v. Univ. of Sciences, 961 F.3d 203, 208 (3d Cir. 2020), but may not "assume that [the plaintiff] can prove facts that it has not alleged[,]" Twombly, 550 U.S. at

---

[1] The Court previously granted Plaintiff leave to replead his claims regarding the withholding of timely and appropriate medical care. See Godson, WL 757101, at * 20. Plaintiff's claims that Harris and Watson denied him medical care (Count IX) and that the City is liable for unsanitary conditions and inadequate medical care (Count X) are pled in the current form for the first time in the Third Amended Complaint.

563 n.8 (quoting <u>Associated Gen. Contractors of Cal., Inc. v. Carpenters</u>, 459 U.S. 519, 526 (1983)).

IV. **DISCUSSION**

    A. **Claims against Harris and Watson**

Godson brings four claims against Harris and Watson that are subject to the present Motion to Dismiss. For the reasons explained below, the Court finds that Count IX (denial of medical care), Count VI (unreasonable search and seizure), Count VII (conspiracy to deprive plaintiff access to the courts), and Count VIII (conspiracy to deprive plaintiff of equal access to the laws) are sufficiently pled.

    1. **Unreasonable Search and Seizure (Count VI)**

In Count VI, Godson brings an unreasonable search and seizure claim in violation of the Fourth Amendment. Defendants argue that Godson's allegations are insufficient to reasonably infer that Godson's person was searched. MTD at 5, ECF 22. While in Godson's view the "search" was in effect the application of excessive force, Godson contends that since Harris and Watson stated that they were conducting a search, they must justify its reasonableness. Resp. at 8, ECF 25. In reply, Defendants assert that Godson has not alleged that his person was unlawfully searched. Reply at 1-2, ECF 26.

Imprisoned individuals do not have a privacy interest in their cells, however, they do maintain a narrow Fourth Amendment right to be free of bodily searches. <u>See Parkell v. Danberg</u>, 833 F.3d 313, 325-26 (3d Cir. 2016). To determine whether a bodily search violates a pretrial detainees Fourth Amendment right "[c]ourts must consider the scope of the particular

4

intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559 (1979).[2]

The Second Amended Complaint alleges that "Defendants . . . entered into Plaintiff's cell, purportedly in search of a spoon" and "search[ed] Plaintiff and his cell." 2d Am. Compl. at ¶¶ 8, 67. Given that pretrial detainees lack privacy interests in their cells, only Godson's bodily privacy interests are at stake. See Parkell, 833 F.3d at 325. To start, Godson alleges that the scope and manner of the supposed search where unreasonable, escalating to a point of excessive force. 2d Am. Compl. at ¶ 8. Godson next alleges that Harris and Watson's justification for initiating the search, to search for a spoon, was pretextual. Id. Finally, Godson alleges that the search occurred in his cell in the infirmary unit. Id. at ¶ 7. At this early stage of litigation, Godson has sufficiently pled an unreasonable search claim, he alleges that there was no legitimate pedological justification for the search, that the search occurred in the prison's infirmary unit, and that the search took on an unreasonable scope and manner. The Motion to Dismiss is denied as to Godson's unreasonable search and seizure claim against Harris and Watson (Count VI).

### 2. Conspiracy to Deprive Plaintiff of Access to the Courts (Count VII)

In Count VII, Godson brings a § 1983 conspiracy "to deprive plaintiff of access to the courts" claim in violation of the Fourteenth Amendment against Harris and Watson. Godson alleges that Harris and Watson conspired to cover up their use of excessive force and unreasonable search and seizure, thereby depriving Godson of his right to access the courts and "decreasing the value of his claims against all of the Defendants." 2d. Am. Compl. at ¶ 74.

---

[2] In Parkell the Third Circuit reiterated its holding from Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 621 F.3d 296, (3d Cir. 2010), that "[t]he Bell analysis applies equally to all individuals [properly assigned to the facility's general population]—whether they be convicted inmates, indicted pretrial detainees, contemnors, material witnesses, or arrestees awaiting preliminary hearings before a magistrate."

Defendants argue that Godson's allegations are conclusory and thus insufficient to plead his claim. MTD at 6. Godson responds that "[r]eduction of the value of an action by a cover-up is sufficient harm in a claim for conspiracy to deny access to the courts." Resp. at 10 (quoting Vasquez v. Hernandez, 60 F.3d 325, 329 (7th Cir. 1995)). Defendants reply that the claimed injury is insufficient and thus should be dismissed. Reply at 2.

To start, the Court previously found that the Complaint adequately alleges that Harris and Watson conspired to cover up the use of excessive force by fabricating reports and falsifying statements. Godson, 2025 WL 757101, at *6. The issue is thus whether this conspiracy deprived Godson of his right to access the courts. Inmates' access to courts claims are limited to two categories: challenges to their sentences and conditions of confinement. Monroe v. Beard, 536 F.3d 198, 205 (3d Cir. 2008) (citing Lewis v. Casey, 518 U.S. 343, 354-55 (1996)). In the Second Amended Complaint, Godson brings a conditions of confinement claim against the City (Count X). Thus, Godson alleges that Harris and Watson's actions deprived him of his right to access the courts, a right he sought to exercise, in part, to challenge the conditions of his confinement. The Motion to Dismiss is denied as to Godson's § 1983 conspiracy claim against Harris and Watson (Count VII).

### 3. Conspiracy to Deprive Plaintiff of Equal Protections of the Law (Count VIII)

In Count VIII Godson brings a § 1985 Conspiracy to "deprive plaintiff of equal protection of the laws" claim under the Fourteenth Amendment against Harris and Watson. Defendants argue that Godson's allegations are conclusory and thus insufficient to plead his claim. MTD at 9. Godson responds that his transfer to another correctional facility impedes his counsel's ability to confer with him, and requests leave to amend the claim. Resp. at 11.

6

The applicable laws is § 1985(3), "[d]epriving persons or rights or privileges."³  See 42 U.S.C. § 1985(3).  To plead a § 1985(3) conspiracy, Godson must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."  United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828-29 (1983).  The Third Circuit has elaborated that "a plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious."  Farber v. City of Paterson, 440 F.3d 131, 135 (3d Cir. 2006).

The Second Amended Complaint states that "[t]he actions and inactions taken against the Plaintiff occurred due to his race, African American, and his mental disabilities."  2d Am. Compl. at ¶ 76.  Godson pled two identifiable classes: race and mental disability.⁴  To state a § 1985(3) conspiracy claim, Godson must show that Harris and Watson conspired against him because of his race or mental disability.  See United Bhd., 463 U.S. at 828-29.  The Court will allow Godson's § 1985(3) claim to proceed, with the expectation that during discovery Godson develop more specific facts that link Harris and Watson's alleged actions to his race and mental disability.  The Motion to Dismiss is denied as to Godson's § 1985(3) conspiracy claim against Harris and Watson (Count VIII).

---

³ Godson does not identify a specific provision of § 1985 in the Second Amended Complaint.  Consistent with its Opinion regarding the first Motion to Dismiss, the Court assumes that Godson brings Count VIII under § 1985(3). See Godson, 2025 WL 757101, at *11.
⁴ Mental disabilities are a protected class under § 1985(3).  See Lake v. Arnold, 112 F.3d 682, 686-88 (3d Cir. 1997), as amended (May 15, 1997).

7

### 4. Denial of Medical Treatment (Count IX)

In Count IX, Godson brings a § 1983 "denial of medical treatment" claim in violation of the Fourteenth Amendment for the delay in medical care related to his MRSA infection against Harris and Watson. Defendants argue that Godson's allegations are not particular and thus insufficient to plead his claim. MTD at 8. Godson responds that the allegations specifically refer to Harris and Watson and thus are sufficient. Resp. at 10.

To raise denial of medical treatment claims, inmates must show that "(1) the alleged deprivation is objectively, sufficiently serious, and (2) the defendant acted with deliberate indifference to inmate health or safety." Thrower v. Alvies, 425 F. App'x 102, 105 (3d Cir. 2011) (non-precedential) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).[5] Deliberate indifference can by shown by "a prison official intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Casilla v. N.J. State Prison, 381 Fed. App'x. 234, 236 (3d Cir. 2010) (non-precedential) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

The Second Amended Complaint satisfies the first element. Godson alleges an objectively, sufficiently serious deprivation, he contracted MRSA and required hospitalization and surgery. See 2d Am. Compl. at 19.

Godson also sufficiently pled the second element, deliberate indifference of prison officials. An allegation that a prison official was aware that a prisoner required medical treatment but refused to provide it is sufficient to allege deliberate indifference. See Ruse v.

---

[5] The Fourteenth Amendment "provides pretrial detainees with at least as much protection as is afforded to prisoners raising denial-of-medical-treatment claims under the Eighth Amendment." Thrower, 425 F. App'x at 105 (citing Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581-82 (3d Cir. 2003)). The Third Circuit applied the Eighth Amendment standard to determine whether a pretrial detainee's rights were violated. See id.

8

Plantier, 182 F.3d 192, 197 (3d Cir. 1999). First, Godson alleges that Harris and Watson had knowledge of his need for medical treatment. See 2d Am. Compl. at ¶ 17 (Godson "made numerous written and oral requests to . . . Haris and Watson . . . for treatment of his MRSA infection."). Next, Godson alleges that Harris and Watson refused to provide the necessary medical treatment for his MRSA infection. Id. at ¶ 79 (Harris and Watson "den[ied] and/or ignore[ed] Plaintiff's requests for medical treatment for his MRSA infection."). The Motion to Dismiss is denied as to Godson's § 1983 Denial of Medical Treatment claim against Harris and Watson (Count IX).

### B. Monell Claims

Godson brings Monell claims for unsanitary prison conditions and denial of medical treatment (Count X) and use of unnecessary and excessive force (Count XI). Defendants argue that both claims are insufficiently pled. MTD at 10. Godson argues that the claims allege sufficient facts and should not be dismissed. Resp. at 11. For the reasons explained below, the Court finds that both claims are sufficiently pled.

To establish municipal liability a plaintiff must show "both that his rights were violated and that the city is liable for that violation." Hightower v. City of Phila., 130 F.4th 352, 355 (3d Cir. 2025). As a municipality is not vicariously liable for employees' unconstitutional conduct, plaintiffs must show that a municipal policy or custom violates the Constitution, or if not unconstitutional itself, is the "moving force" behind the constitutional violation. Thomas v. Cumberland Cnty., 749 F.3d 217, 222 (3d Cir. 2014).

Thus, Godson may establish the City's liability by showing that his injuries were caused by (1) an unconstitutional policy or custom of the City, or (2) a failure or inadequacy by the City that reflects a deliberate or conscious choice. See Forrest v. Parry, 930 F.3d 93, 105 (3d Cir.

2019). While policy and custom claims and failure or inadequacy claims are closely related, "the avenues remain distinct: a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected." Id. at 106.

### 1. Unsanitary Conditions and Denial of Medical Treatment (Count X)

Godson alleges that the City is liable on the grounds that the Philadelphia Department of Prisons ("PDP") "maintained conditions including overcrowding, inadequate staffing to provide essential services such as maintaining sanitary and hygienic facilities for prisoners and responding to prisoners' requests for medical care and treatment, and failing to implement adequate sanitation and hygiene practices that conformed to generally accepted standards." 2d Am. Compl. at ¶ 21. Godson asserts that "[t]hese continuous failures constituted unconstitutional customs, policies, and practices on the part of Defendant City and caused unsafe, unsanitary, and overcrowded conditions which caused the spread of MRSA and failure to treat MRSA cases among prisoners[.]" Id.

While Godson brings unsanitary conditions and denial of medical treatment claims under one count, these are two distinct claims and must be analyzed separately. Further, as it is unclear whether Godson brings a policy/custom or failure to supervise, train or discipline claim, the Court will assess the sufficiency of the pleading under both theories.

### a. Conditions of Confinement
#### i. Constitutional Violation

"To establish a constitutional violation based on conditions of confinement under the Fourteenth Amendment, a pretrial detainee must plausibly allege that the conditions amounted to punishment." Taylor v. Pennsylvania, 2018 WL 6574187, at *11 (E.D. Pa. Dec. 12, 2018)

(citing Bell v. Wolfish, 441 U.S. 520, 538 (1979)).  If a condition of pretrial detention "is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees." Bell, 441 U.S. at 539.  Thus, a condition of confinement is unconstitutional if it is either "the result of an express intent to punish" or "is not rationally related to a legitimate government purpose." Id. at 538-39.

Allegations of overcrowding, restrictions on movement, temperatures that cause physical discomfort, only one set of fingernail clippers for an entire unit, mold, lack of hot water, insect bites, and housing MRSA patients with non-infected prisoners are sufficient to plead a constitutional violation.  See Pichalskiy v. Nutter, 2016 WL 7018545, at *2 (E.D. Pa. Nov. 30, 2016) (Goldberg) (overcrowding, restrictions on movement); David v. Yates, 2016 WL 5508808, at *7 (D.N.J. Sept. 27, 2016) (temperatures); Conway v. Cty. of Camden, 2017 WL 3783263, at *2-3 (D.N.J. Aug. 31, 2017) (fingernail clippers, mold, hot water, insect bites, MRSA precautions).  Godson allegations – that PDP failed to maintain adequate sanitation (including cleaning solutions, hand-washing facilities, and hygiene supplies), provide sufficient out of cell time for medical services and hygiene, and prevent overcrowding and inadequate staffing – are sufficient to allege a conditions of confinement claim.  2d Am. Compl. at ¶ 21.

However, plaintiffs must do more than just allege deficiencies in the conditions of their confinement; plaintiffs must also "allege how [they were] harmed by the unsanitary conditions." Hainey v. Carney, 2022 WL 1308510, at *8 (E.D. Pa. May 2, 2022) (Younge).  Godson satisfies this requirement.  Godson alleges that the unsanitary conditions "caused the spread of MRSA"

through the prison and "caused plaintiff to contract MRSA." Id. at ¶¶ 21, 85. Taken as true, Godson's allegations regarding sanitary conditions make it plausible that these practices are not rationally related to any legitimate government interest.

### ii. Custom or Policy

Godson points to no official PDP policy condoning unsanitary prison conditions. As such, the Court must determine whether Godson "identif[ies] a custom" of the PDP and "specif[ies] what exactly that . . .custom was," McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009), and then pleads facts that demonstrate a "direct causal link" between the PDP's custom and the "alleged constitutional deprivation," Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 249 (3d Cir. 2007).

Godson "identifies a custom" of overcrowding, inadequate staffing, and failing to implement adequate sanitation and hygiene practices. See 2d Am. Compl. at ¶ 21. Godson also "specifies what exactly that custom was." For example, Godson alleges that PDP failed to make sanitation solutions such as hand sanitizers and cleaning wipes available, provide inmates and staff with handwashing supplies, instruct inmates and staff on the need for regular handwashing, provide adequate out of cell time for showering, and coordinate with local law enforcement and court officials to prevent overcrowding. Id. Finally, Godson pleads facts that demonstrate a "direct causal link" between this custom and his contraction of MRSA. Godson alleges that the unsanitary conditions "caused the spread of MRSA" through the prison and "caused plaintiff to contract MRSA." Id. at ¶¶ 21, 85. The Motion to Dismiss Count X as it is predicated on a custom pertaining to unsanitary conditions of confinement is denied.

### iii. Failure to Train, Supervise, or Discipline

To plead a failure to supervise, train or discipline claim a plaintiff must show that the failure "amounts to deliberate indifference to the constitutional rights of those affected." Forrest,

12

930 F.3d at 105. The "legal requirement for deliberate indifference is whether "(1) municipal policymakers know that *employees* will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights. Id. (citing Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999)).

First, Godson alleges that municipal policymakers were aware of the unsanitary prison conditions. 2d Am. Compl. at ¶. Godson points to an article in which City Controller Rebecca Rynhart acknowledges severe understaffing at Philadelphia prisons causing inmates to be confined to their cell for 22-23 hours a day. See 2d Am. Compl. at ¶ 22. This is sufficient to show that municipal policymakers knew that PDP employees would confront at least understaffing issues, which Godson alleges contributed to unsanitary prison conditions. Second, Godson alleges that as of September 2021, the PDP was 479 people short of the 1,884 people needed to fully staff its jails and that by January 2022, PDP had approximately 582 fewer staff than called for in its own deployment plan while simultaneously averaging an absenteeism rate of 25%. See id. Godson also points to an article in the Philadelphia Inquirer where Rynhart stated that "[t]here's a real humanitarian disaster going on . . .[t]here's a responsibility that the mayor's administration should be exercising." Id. (quoting Samantha Melamed, Panic attacks and 20-hour workdays: why Philly corrections officers are quitting in droves, The Philadelphia Inquirer (Jan. 4, 2022)). Further, a former corrections officer stated that she quit because she could no longer be a party to "human rights violations" that included people "pleading for toilet paper." Id. (quoting Melamed, Panic attacks and 20-hour workdays). This is sufficient to show a difficult choice, PDP staff had to make difficult choices as to the prison's sanitation conditions, as well as a history of employee mishandling, PDP was significantly understaffed over a multi-

13

year period. Lastly, Godson points to four examples where inmates were not provided with toilet paper, denied use of the shower or other means to clean themselves, and housed in cells that were not regularly cleaned. Id. at ¶ 21. These examples, coupled with the articles cited to by Godson in which the City Controller described PDP facilities as a "humanitarian disaster" and a corrections officer recounted prisoners begging her for toilet paper, is sufficient to show that a wrong choice by an employee will frequently cause unsanitary conditions.

Finally, to establish causation, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." Thomas, 749 F.3d at 226. Specifically, the Court inquires into whether the "alleged injury [could] have been avoided had the officers been trained under a program that was not deficient in the identified respect." Id. It is plausible that Godson would not have contracted MRSA if there was adequate staffing, a proper number of inmates to a cell, and clear sanitation and cleanliness protocols, particularly in the medical unit.

### b. Inadequate Medical Care
#### iv. Constitutional Violation

The Second Amended Complaint states that Godson "made numerous written and oral requests to Defendants City . . . for treatment of his MRSA infection, both before and after July 21, 2022, but same were ignored or denied, causing his condition to worsen." 2d Am. Compl. at ¶ 17. As with Godson's claim against Harris and Watson (Count IX), Godson's allegation that the City repeatedly denied his requests for treatment is sufficient to plead a constitutional violation against the City.

#### v. Unconstitutional Policy or Custom

As Godson points to no official policy, Godson must "identify" a PDP custom and "specify what exactly that . . . custom was," McTernan, 564 F.3d at 658, and then plead facts

14

demonstrating "a direct causal link" between the PDP custom and the "alleged constitutional deprivation." Jiminez, 503 F.3d at 249.

Godson "identifies a custom" of overcrowding, inadequate staffing, and failing to implement adequate sanitation and hygiene practices. See 2d Am. Compl. at ¶ 21. Godson also "specifies what exactly that custom was." For example, Godson alleges that PDP failed to coordinate with local law enforcement and court officials to prevent overcrowding, respond to prisoners' requests for medical care and treatment, and follow sanitation and hygiene practices outlined by the Center for Disease Control and Prevention and the Federal Bureau of Prisons. Id. Lastly, Godson pleads facts that demonstrate a "direct causal link" between this custom and his contraction of MRSA and the delay in medical treatment. Godson alleges that the custom of overcrowding, understaffing, and poor sanitation "caused the spread of MRSA," "caused plaintiff to contract MRSA," and caused a "failure to treat MRSA cases among prisoners, including the Plaintiff." Id. at ¶¶ 21, 85. The Motion to Dismiss Count X as it is predicated on a custom pertaining to inadequate medical care is denied.

### vi. Failure to Train, Discipline or Supervise

As discussed, to plead a failure to train, supervise, or discipline claim, Godson must show deliberate indifference. See Forrest, 930 F.3d at 105.

First, Godson points to the article in which City Controller Rynhart acknowledges severe understaffing at Philadelphia prisons. See 2d Am. Compl. at ¶ 22. This is sufficient to show that municipal policymakers knew that PDP employees would confront at least understaffing issues, which Godson alleges contributed to his denial of medical care. Second, Godson alleges PDP was understaffed by 479 and 582 people in 2021 and 2022 respectively, while simultaneously averaging an 25% absenteeism rate. See id. Godson also points to Rynhart's statement that

"[t]here's a real humanitarian disaster going on . . .[t]here's a responsibility that the mayor's administration should be exercising." Id. (quoting Samantha Melamed, Panic attacks and 20-hour workdays: why Philly corrections officers are quitting in droves, The Philadelphia Inquirer (Jan. 4, 2022)). Further, the correctional officers' union noted that in 2021, eighteen people died in Philadelphia prisons and the Philadelphia Inquirer reported that there were no staff present to intervene when homicides and other assaults occurred. Id. (quoting Melamed, Panic attacks and 20-hour workdays). This is sufficient to show that PDP employees had to make difficult choice regarding inmates' care, and a history of employee mishandling as PDP was significantly understaffed over a multi-year period. Lastly, Godson points to nine examples where inmates' care, including medical treatments, doctors' visits, and outside cell time, was delayed or denied. Id. at ¶ 21. These examples, coupled with the articles cited to by Godson in which corrections officers explicitly stated that understaffing caused inmates to receive inadequate outside cell time and protection (i.e. corrections officers ignored inmates' requests for help during assaults and the number of PPD deaths increased during the post-Covid staffing shortages) is sufficient to show that a wrong choice by an employee will frequently cause inadequate medical care.

Finally, it is plausible that Godson would not have contracted MRSA or been delayed in receiving medical care if there was adequate staffing, a proper number of inmates to a cell, and clear sanitation and cleanliness protocols, particularly in the medical unit.

### 2. Use of Unnecessary and Excessive Force (Count XI)

Godson alleges that the City had "policies, practices and procedures . . . of inadequate use of force training, inadequate use of force reporting and investigation, inadequate use of force reviews, not requiring the use of de-escalation and verbal communication where force was not required, and condoning unnecessary and excessive use of force." 2d Am. Compl. at ¶ 22. The

Court previously found that Godson sufficiently alleged a constitutional violation of excessive force. Godson, 2025 WL 757101, at *7-8.

### a. Unconstitutional Policy or Custom

Godson identifies both an official policy, PDP's force policy, and a custom of inadequate force training, reporting and investigation, and reviews, not requiring de-escalation, and condoning unnecessary and excessive force.

Having identified both a policy and custom, Godson next "specif[ies] what exactly that policy or custom was." Godson points to the Monitor's Report in Remick et al. v. City of Philadelphia et al., that found that PPD's force policy "is the point of departure for problematic use of force practices . . . The policy emphasizes de-escalation but ultimately authorizes the use of force if a Class Member fails to comply with verbal commands absent active resistance of assaultive behavior." 2d. Am. Compl. at ¶ 25, Ex. A at 61-62.[6] The Monitor's Report also found that the policy "require[d] a clear statement of zero-tolerance for excessive or unnecessary force." Id. Additionally, Godson lists twelve civil actions against the City from 2014 to 2021, alleging excessive force by corrections officers against inmates. Id. at ¶ 23. This evidence sufficiently establishes that PDP's force policy had flaws and a plausible custom under prevailing law. In Beck, the Court held that five civilian complaints detailing similar excessive force within five years of the plaintiff's injury adequately established a pattern. 89 F.3d at 970-73. Here, six of Godson's twelve cases occurred within five years of his incident, which exceeds Beck's threshold, while the remaining six occurred within eight years.

Lastly, Godson pleads facts demonstrating a "direct causal link" between the PDP's force policy and custom of using unnecessary or excessive force and his injuries. The City had clear

---

[6] The Monitor's Second Report reviews the City's compliance with the settlement agreement through December 31, 2022.

17

knowledge of similar unlawful conduct involving excessive force, as evidenced by numerous civil lawsuits filed within the past five years. Further, the Monitor's Report, which is prominently available on the PDP website, reinforces that excessive force is not merely occasional but part of a widespread and persistent pattern. See 2d Am. Compl. at ¶ 24 n.4. Despite this explicit awareness, the continued filing of excessive force lawsuits against PDP plausibly suggests, at this stage of litigation, that the City failed to take sufficient measures to address the issue. Count XI as it pertains to an unconstitutional policy or custom is sufficiently pled.

### b. Failure to Train, Discipline, or Supervise

As previously stated, a failure to train, supervise, or discipline claim requires a showing of deliberate indifference. See Forrest, 930 F.3d at 105. First, Godson alleges that municipal policymakers were aware that PDP staff were inadequately trained on use of force, use of force reporting and investigation, and use of force reviews. 2d Am. Compl. at ¶ 24. Specifically, Godson points to the Monitor's Report that found that the force policy lacked "a clear statement of zero-tolerance for excessive force." Id. This is sufficient to show that municipal policymakers knew that PDP employees would confront use of force situations for which they had been inadequately trained. Second, Godson points to twelve civil lawsuits involving excessive force by PDP staff. Id. at ¶ 23. This is sufficient to show a clear history of employee mishandling. Third, Godson alleges that the failure to train PDP staff on de-escalation techniques coupled with a force policy that expressly authorized the use of force in response to noncompliance with verbal commands, even in the absence of active resistance or assaultive conduct, caused PDP staff to improperly use force on imprisoned individuals. Id. at ¶¶ 26-27. This is sufficient to show that the wrong choice by a PDP employee, that is what use of force is appropriate, frequently result in unnecessary or excessive force.

Lastly, causation is established because the Monitor's Report found a pattern of excessive force, as alleged by Godson, and explicitly stated that "use of force incidents warranted additional training for personnel." See 2d Am. Compl. at ¶ 24 n.4. This demonstrates that adequate training could have prevented the alleged use of excessive force against Godson. The Motion to Dismiss Count XI as it pertains to a failure train, supervise, or discipline resulting in excessive force is denied.

V.     **CONCLUSION**

For the reasons explained above, Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint is **DENIED**.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 24\24-6461 Godson v City of Phila\24-6461 MTD Memo Opinion re 3d Am Compl.docx

19